# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 23, 2010 Session

## ANDREW NEAL DAVIS v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Davidson County
### No. 2001-A-391   Cheryl A. Blackburn, Judge

---

### No. M2009-00423-CCA-R3-PC - Filed July 14, 2010

---

Petitioner, Andrew Neal Davis, was convicted by a Davidson County Jury of first degree felony murder and aggravated child abuse. *State v. Andrew Neal Davis*, No. M2002-02375-CCA-R3-CD, 2004 WL 1562544 (Tenn. Crim. App., at Nashville, Jul. 9, 2004), *perm. app. denied*, (Tenn. Dec. 6, 2004). Petitioner's convictions were affirmed on direct appeal. *Id.* at *1. Petitioner filed a petition for post-conviction relief primarily on the basis of ineffective assistance of counsel. Petitioner also argued that the trial court committed various constitutional errors during trial. After a hearing on the petition, the post-conviction court denied the petition for relief. Petitioner appealed to this Court. After a review, we conclude that the post-conviction court properly dismissed the petition for post-conviction relief. Consequently, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Wendy S. Tucker, Nashville, Tennessee, for the appellant, Andrew Neal Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, District Attorney General, and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

Petitioner was indicted in January of 2001 by the Davidson County Grand Jury for first degree murder and aggravated child abuse for his role in the death of C.L.M.,[1] an infant. Petitioner's first trial resulted in a mistrial. *Id.* This Court stated on direct appeal that, at the second trial, the testimony revealed that Petitioner was in a relationship with Jennifer Blankenship, who had an eight-month-old son, C.L.M. *Id.* Petitioner and Ms. Blankenship started dating in September of 1999 and were engaged to be married. *Id.* Petitioner stayed at Ms. Blankenship's apartment on January 27, 2000. *Id.* That morning, they left the baby with Ms. Blankenship's mother while they went to the grocery store. *Id.* After picking up the child and returning to the apartment, Ms. Blankenship left the child with Petitioner while she ran some errands. *Id.* The baby was fussy, so Ms. Blakenship put him down for a nap before leaving. *Id.* Ms. Blankenship stopped by her mother's house, where an in-home day care center was located and stayed there to supervise the children while her mother went to the bank.

> While she waited for her mother to return, Ms. Blankenship called [Petitioner] to see if the victim had fallen asleep. [Petitioner] answered the telephone before it rang suggesting that they had been calling each other at the same time. [Petitioner] told Ms. Blankenship that he had just checked on the victim because he had stopped crying, and that the victim would not respond to him when [Petitioner] called out his name or touched the baby. [Petitioner] did not tell her that the victim was having trouble breathing. Ms. Blankenship called her friend, Shannon Monticello, who was working that day at the apartment complex. Ms. Blankenship asked Ms. Monticello to check on the victim because Ms. Blankenship could not leave her mother's house until Ms. Chilton returned. Ms. Blankenship called [Petitioner] to tell him that Ms. Monticello was on the way, and he told her that the victim was still not responding to his touches or words. Ms. Blankenship asked [Petitioner] to hold the victim up to the telephone, and she heard the victim gasping for breath.

*Id.* at *3. When Ms. Monticello got to the apartment, the front door was open. Ms. Monticello noticed a white trash bag beside the front door. *Id.* at *4. The baby was "limp and gasping for air" and could not hold his head up. *Id.* Petitioner got a busy signal when

---

[1] It is the policy of this Court to refer to minor victims of abuse by their initials.

he tried to call 911 and slammed the phone against the wall. Ms. Monticello fixed it and dialed 911 herself. Petitioner "told the dispatcher that he had put the victim in his crib for his nap, and when he looked in on him a few minutes later the baby was limp and unresponsive." *Id.* Ms. Monticello performed CPR until paramedics arrived and did not notice any abrasions or cuts on the child's face or mouth. *Id.*

> When Ms. Blankenship arrived at the apartment, the paramedics were performing CPR on the victim. [Petitioner] was wearing only shorts at this time despite the cold weather. When she and [Petitioner] left the apartment to follow the ambulance to Summit Medical Hospital, Ms. Blankenship noticed that the groceries were still on the kitchen floor. [Petitioner] did not tell Ms. Blankenship that the victim had been bleeding from the mouth while she was gone. On the way to the hospital, [Petitioner] grew angry and struck his fists against the steering wheel. When Ms. Blankenship looked at him, [Petitioner] acted like nothing had happened.

> Later that afternoon, while Ms. Blankenship stayed at the hospital, [Petitioner] accompanied the police back to Ms. Blankenship's apartment. [Petitioner] telephoned her twice from the apartment. The first time he merely asked what was going on without inquiring about the victim. During the second phone call, [Petitioner] told Ms. Blankenship that in case the police questioned her, the victim had been bleeding that afternoon, that he had cleaned the victim's face, and that he threw the baby's shirt and washcloth into the trash because it was blood-stained. Ms. Blankenship said that [Petitioner] relayed that information nonchalantly.

> . . . .

> At the request of the police, Ms. Blankenship taped [Petitioner's] telephone calls to her because she wanted answers to her questions. During the first telephone call, [Petitioner] told Ms. Blankenship that a friend of his had found some information about head injuries on the internet and reminded her that she had said the victim was different when he returned from visiting his father, Aaron McPeak. [Petitioner] admitted that he removed the trash bag containing the victim's shirt and the washrag he used to wipe the blood from the victim's mouth because he was scared. [Petitioner] denied that he told the police that the washrag was "dripping with blood." In a subsequent call, [Petitioner] told Ms. Blankenship that his friend's internet research indicated that the victim could have sustained a blood clot on his brain two to three weeks before any symptoms appeared.

On February 26, 2000, [Petitioner] explained in another taped telephone conversation that he first noticed the blood in the victim's mouth after his first telephone conversation with Ms. Blankenship. [Petitioner] told Ms. Blankenship that he ran to the bathroom to get a wet washcloth and cleaned out the victim's mouth. Because the baby also had blood on his shirt, [Petitioner] said that he changed the victim's tee shirt. [Petitioner] said that when he ran to let Ms. Monticello in, he dropped the washcloth and shirt in the trash can in the kitchen on his way to the front door. [Petitioner] remembered that he took the trash bag with him as he left the house to go to the hospital and placed the bag outside the apartment door. [Petitioner] told Ms. Blankenship that she was already downstairs by the car when he left the apartment. Ms. Blankenship disagreed with [Petitioner's] version and reminded him that they left the apartment together. Ms. Blankenship asked [Petitioner] why he was so concerned about the trash when they were taking the victim to the hospital, and [Petitioner] said that he was in shock and not thinking clearly.

*Id.* at *3. When the child was taken to the hospital:

Dr. Bryan Sharpe was the physician who treated the victim at Summit Medical Hospital. When the baby arrived, he was in full respiratory arrest. The paramedics had inserted a tube into the victim's windpipe on the way to the hospital. Dr. Sharpe did not recall anyone yanking on the baby's upper lip and did not notice the victim's torn frenulum which is the membrane that attaches the upper lip to the gum. Dr. Sharpe said that only a minimum amount of pressure was needed to open an unresponsive patient's mouth. Initially, Dr. Sharpe believed that the victim had an infection so he administered antibiotics to the baby. Family members told Dr. Sharpe that the victim was put in the crib for his nap and then developed breathing difficulties.

After further examination, Dr. Sharpe felt some swelling at the back of the victim's head in the parieto-occipital region. An x-ray revealed a large fracture beneath the swollen area, and Dr. Sharpe confirmed retinal hemorrhaging. Because of the urgency surrounding the victim's medical treatment, Dr. Sharpe only ordered a single x-ray of the swollen area of the victim's head rather than a complete skull series. The purpose of the x-ray was merely to confirm Dr. Sharpe's suspicions of a fracture and assist in determining how to treat the victim. The victim was then flown by helicopter to the Vanderbilt pediatric intensive care unit because Summit Medical Hospital was not equipped to handle a critically injured child. Dr. Sharpe told the family members that the victim had suffered a skull fracture. One of the

-4-

family members asked if the fracture could have occurred if the victim hit his head on the crib's railing. Dr. Sharpe told them that the victim's injury was very serious and caused by a stronger force than bumping his head. Dr. Sharpe asked if the victim had been dropped or if he had struck his head on any object, but no one offered any information.

*Id.* at *5. Dr. Ellen Clayton of Vanderbilt Hospital was qualified by the trial court as an expert in pediatrics and child abuse. *Id.* at *6. Dr. Clayton observed "some bruising on [the victim's] forehead, a large bruise over the left side of the back of his head, and massive retinal hemorrhaging" due to a "major head injury." *Id.* Dr. Clayton opined that "the victim's injuries were not consistent with a fall on to a carpeted surface" and that an injury to the frenulum is "generally inflicted rather than accidental." *Id.* Dr. Clayton also described three "separate complex fractures that were not symptomatic of a short fall." *Id.* at *7.

Dr. John Gerber conducted the autopsy and concluded that the victim's death was caused by blunt force trauma and that the manner of death was homicide. *Id.* According to the autopsy, "[a]n external examination revealed that the victim had an abrasion on the right side of his head, two contusions on his forehead, and a laceration of the frenulum in his mouth. An internal examination revealed two occipital skull fractures and one parietal skull fracture," as well as hemorrhaging. *Id.* Dr. Gerber described the skull fractures as follows:

The three skull fractures were complex rather than linear fractures. Linear fractures occur most frequently in accidental falls. Dr. Gerber testified that it would take more force to produce a complex fracture than a linear fracture. The lack of interrelation between the three fractures suggested at least two, and maybe three, separate blows. The position of the three fractures indicated that the victim received a direct blow to the side of the head and also struck the back of his head on a hard surface. The victim would have lost consciousness and experienced breathing difficulties immediately following the infliction of the injuries. Dr. Gerber said that he would not expect to see the types of injuries suffered by the victim on a child who was dropped from a height of six feet to a carpeted surface. If the victim had been dropped and struck his head on a hard object before hitting the floor, the victim would have incurred one linear fracture. Furthermore, because a baby's head is the heaviest part of the body, Dr. Gerber said that if the victim fell over [Petitioner's] shoulder he would expect to see the first point of impact on the top of the victim's head, not the back of his head. In Dr. Gerber's opinion, the victim's injuries were inconsistent with [Petitioner's] explanation that he accidently dropped the victim on to the carpet.

*Id.* at *7. There was testimony that falls from short distances can cause lethal injuries. *Id.* at *8.

Jeff Goodwin, a detective with the Metro Nashville Police Department, was shown around the apartment by Petitioner. *Id.* Petitioner gave inconsistent stories to Detective Goodwin, telling him first that he did not notice any blood on the victim's mouth that day and then telling the Detective that he noticed blood in the victim's mouth after he spoke with Ms. Blankenship the first time. Petitioner explained during the second interview:

> He used the washcloth to wash the blood out of the victim's mouth and then changed the baby's shirt because it was stained with blood. [Petitioner] said that he threw the cloth and shirt in the trash when he went to open the door for Ms. Monticello. [Petitioner] said that the victim was all right when Ms. Blankenship left the apartment and insisted that no one else had been in the apartment while she was gone. Detective Goodwin asked [Petitioner] if he had dropped the baby, and [Petitioner] said no.

*Id.*

Petitioner testified at trial. According to Petitioner, after Ms Blankenship left the apartment, Petitioner changed clothes then checked on the baby. Because the baby was awake, Petitioner decided to take the baby into the living room. Petitioner testified that:

> [He] propped the victim up against his shoulder and held him around his calves. [Petitioner] reached back into the crib for the victim's pacifier and blanket. When he stood up, a sharp pain shot through his back,[2] he let go of the victim's legs, and the victim fell over [Petitioner's] shoulder on to the floor. [Petitioner] did not see or hear what the victim's body struck during the fall. When he turned around, the victim was lying on his back near the rocking chair and footstool. [Petitioner] said that he could not get a response out of the baby and laid the victim back in his crib. At this point, [Petitioner] only thought that the wind had been knocked out of the victim. He went to telephone Ms. Blankenship. When he returned to the victim's bedroom, he saw blood between the baby's lips. He removed the baby from the crib, washed his mouth, and changed his shirt. [Petitioner] said that the victim was limp during this time.

---

[2] There was testimony at trial that Petitioner suffered from back problems. *Id.* at *3.

*Id.* at *9.

The State offered the testimony of Dr. Bruce Levy, the Chief Medical Examiner for Davidson County, in rebuttal.

> Dr. Levy said that he reviewed Dr. Gerber's autopsy report and agreed with his conclusion that the victim suffered from three separate complex skull fractures. Dr. Levy said that the victim's injuries, other than the abrasion above his eye, were not consistent with [Petitioner's] testimony that he dropped the baby. Dr. Levy testified that the victim would not have incurred complex fractures from a fall onto a carpeted surface, and in Dr. Levy's opinion, the injuries were intentionally inflicted upon the baby.

*Id.*

After hearing the evidence, the jury convicted Petitioner of first degree murder and aggravated child abuse. *Id.* at *10. Petitioner received a life sentence for the first degree murder conviction and a sentence of twenty-two years for the aggravated child abuse conviction. *Id.* at *1. Petitioner's convictions were affirmed on direct appeal. *Id.*

## Post-Conviction Proceeding

Subsequently, Petitioner filed a petition for post-conviction relief. In the petition, Petitioner claimed that he received ineffective assistance of counsel both prior to trial and at trial. Specifically, Petitioner raised the following allegations of ineffective assistance of counsel: (1) trial counsel failed to obtain an expert witness and present that testimony at trial; (2) trial counsel failed to obtain x-rays from the hospital prior to trial; (3) trial counsel failed to pursue a motion to suppress; (4) trial counsel failed to challenge the admissibility of the tape recordings; (5) trial counsel failed to adequately investigate the case; (6) trial counsel failed to consult with and prepare Petitioner for trial; (7) trial counsel failed to adequately prepare witnesses; (8) trial counsel instructed Petitioner to display no emotion during trial; (9) trial counsel was not prepared for the trial; (10) trial counsel failed to file a motion to prevent the State from using a doll as demonstrative evidence; (11) trial counsel failed to call medical responders as witnesses at trial; (12) trial counsel failed to adequately cross-examine state witnesses; (13) trial counsel failed to present witnesses; and (14) trial counsel failed to object to statements made during closing arguments and the prejudicial cross-examination of Petitioner. Petitioner also argued that the trial court committed a "constitutional error" by allowing the State to "require Petitioner to demonstrate events using a doll" and allowing the prosecution to inflame the jury by using a doll.

The post-conviction court held a hearing on the petition for relief. At the post-conviction hearing, trial counsel testified that he represented Petitioner at both of his trials. Trial counsel was an experienced trial attorney and felt prepared for both trials. In fact, trial counsel spoke with several jurors after the first trial in order to ascertain the most effective portions of the trial.

Trial counsel testified that he met with Petitioner quite a few times about the case. When they first met, Petitioner tried to persuade him that the victim fell off of a piece of furniture. Petitioner later claimed that the injuries were the result of an accident involving a crib. Trial counsel felt as if he was presented with an ethical dilemma about the conflicting stories presented by Petitioner.

Trial counsel stated that he was prepared for Petitioner's first and second trials. During the first trial, he presented the expert testimony of Dr. Charles Harlan in an effort to contradict the State's theory that the victim's injuries were inflicted by Petitioner. Trial counsel contacted Dr. Harlan about testifying during the second trial. Trial counsel was informed that Dr. Harlan was not interested in testifying due to an ongoing investigation into his medical license. Trial counsel tried unsuccessfully to locate another expert that would provide testimony akin to Dr. Harlan's testimony at the first trial. Trial counsel also explained that he was unable to locate an expert that would examine the x-rays or CAT scans and provide testimony about them at trial.

Trial counsel admitted that he was "glad" to say that the State's expert, Dr. Gerber was qualified to testify because he could avoid "taking any more time in front of the jury quibbling over [the expert's] qualifications."

Trial counsel admitted that he did not object to the use of a doll as a demonstrative exhibit. From talking with jurors at the first trial, he was aware that some of the jurors in the first trial found the prosecutor's "exaggerated use of the doll had been somewhat offensive." Trial counsel hoped that the State would employ the use of this exhibit during the second trial because he "wanted to get a similar result." Trial counsel felt that he would not have been successful by objecting in any event. Trial counsel stated that this was a tactical decision.

Petitioner presented his own expert at the post-conviction hearing. Dr. Janice Ophoven testified at the post-conviction hearing. Dr. Ophoven, a pediatric forensic pathologist, reviewed the medical records that she was provided. She noted that she had not received all of the requested records from the hospital but felt that she had sufficient

materials to render an opinion on the case. Dr. Ophoven disagreed with Dr. Gerber's conclusion that the victim's injuries resulted from three blows to the head. Instead, Dr. Ophoven opined that an expert would not be able to determine how the injury took place from a review of the medical records. Dr. Ophoven stated that the fatal injury could have been caused by a fall and a single impact from a distance of approximately three feet. Dr. Ophoven claimed that she could have testified to this information in front of a jury but would not have been able to present the jury with a theory of how the accident took place.

On cross-examination, Dr. Ophoven admitted that she had previously concluded that there was no evidence to indicate that the tear to the victim's frenulum was a recent injury but that the only plausible explanation for the bleeding from the victim's mouth was the tear observed during the autopsy. Dr. Ophoven admitted that the tear could have resulted from abuse or CPR but stated that she could not conclusively say when the injury took place. Finally, Dr. Ophoven stated that she could not conclusively state the cause of the victim's injuries.

Petitioner's mother, Renell Davis, testified that she hired trial counsel to represent Petitioner and had provided him with the name of several potential expert witnesses. Ms. Davis claimed that trial counsel told her that he was not as prepared as he would like to have been for trial due to a high publicity case that trial counsel was working on just prior to Petitioner's second trial.

Petitioner also testified at the post-conviction hearing. Petitioner stated that trial counsel refused to investigate the floor of an apartment similar to the apartment where the injury and death took place. Further, Petitioner claimed that trial counsel did not review his testimony with him prior to trial. According to Petitioner, trial counsel told him not to make eye contact with jurors or show any emotion to the jury. However, on cross-examination, Petitioner claimed that he would have testified the same way regardless of how trial counsel prepared him for trial.

At the conclusion of the post-conviction hearing, the court took the matter under advisement. In a separately issued order, the post-conviction court dismissed the petition for post-conviction relief. Specifically, the post-conviction court determined that the testimony of trial counsel was credible. The post-conviction court determined that trial counsel "attempted to secure an expert witness, but that he was not deficient because expert witnesses refused to participate in the case." Further, the assertion by Petitioner that the testimony of Dr. Ophoven would have been beneficial at trial was discounted by the post-conviction court due to Dr. Ophoven's inability to pinpoint whether the cause of death was accidental or intentional. Next, the post-conviction court determined that trial counsel's decision to stipulate to Dr. Gerber's credential's at trial was an "informed, tactical decision."

The post-conviction court noted that there was no proof that trial counsel failed to obtain x-rays prior to trial as claimed by Petitioner and that trial counsel was prepared for trial and adequately investigated the case. Next, the post-conviction court accredited trial counsel's testimony with regard to preparation of the witnesses prior to trial. Petitioner was unable to show that "he was prejudiced by any alleged deficiency." The post-conviction court determined that the failure of trial counsel to object to the State's use of a doll as demonstrative evidence was a tactical decision. Next, the post-conviction court determined that Petitioner did not testify at the post-conviction hearing regarding the potential testimony of the medical responders and failed to introduce their testimony at the hearing, thus waiving the issue. Further, Petitioner failed to show how trial counsel improperly cross-examined the State's witnesses. The post-conviction court also noted that Petitioner failed to "put on any evidence or testimony as to [trial counsel's failure to address several key points in the closing argument]." In conclusion, the post-conviction court noted that Petitioner "alleged multiple issues related to . . . alleged ineffectiveness [of trial counsel]; however, he has failed to do so sufficiently to meet the clear and convincing evidentiary test. Further, the Petitioner has not demonstrated that he suffered any prejudice as a result of the alleged ineffective assistance." As a result, the post-conviction court dismissed the petition for relief.

Petition filed a timely notice of appeal challenging the post-conviction court's dismissal of the petition for relief.

*Analysis*
*Post-conviction Standard of Review*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or reevaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*Ineffective Assistance of Counsel*

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial

counsel were deficient and (b) that the deficient performance was prejudicial.  *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996).  In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases."  *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975).  In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for trial counsel's deficient performance, the result of the proceeding would have been different.  *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).  "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim."  *Henley*, 960 S.W.2d at 580.

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings.  *See id.* at 578.  However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness.  *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight.  *See Adkins*, 911 S.W.2d at 347.  This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings.  *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case.  *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

## *A. Expert Witness*

Petitioner argues that trial counsel was ineffective for failing to obtain an expert witness.  To support his argument, Petitioner presented the testimony of Dr. Ophoven at the post-conviction hearing who stated that she would have testified at the second trial if she were contacted.  Petitioner also presented his mother's testimony during which she insisted that she provided trial counsel with the names of several experts who were willing to testify on Petitioner's behalf at the second trial.

The testimony at the post-conviction hearing revealed that Dr. Harlan, the Petitioner's expert at the first trial, was unwilling to testify at the second trial.  Trial counsel testified that he tried unsuccessfully to find another expert.  The post-conviction court accredited the testimony of trial counsel, finding that he attempted to find an expert and was not deficient

because all the experts he contacted refused to participate. The post-conviction court also opined that the proposed testimony of Dr. Ophoven was "speculative," and she was unable to take a definitive position in opposition of the State's expert. Further, there was evidence that at least one of the witnesses suggested by Petitioner's mother was being investigated for perjury. The record supports the post-conviction court's determination. *See Hugh Andrew Nicely v. State*, No. M2006-01892-CCA-R3-PC, 2008 WL 544600, at *9 (Tenn. Crim. App, at Nashville, Feb. 22, 2008), *perm. app. denied*, (Tenn. Aug. 25, 2008) (holding that a petitioner did not establish ineffective assistance of counsel where the petitioner was able to provide post-conviction testimony of an expert that disputed the methodology of the State's expert but was unable to provide a conclusion that supported petitioner's version of the events); *Michael Anderson Peek v. State*, No. E2003-00449-CCA-R3-PC, 2003 WL 22734616, at *12 (Tenn. Crim. App., at Knoxville, Nov. 20, 2003)*, perm. app. denied*, (Tenn. Apr. 5, 2004) (affirming decision by post-conviction court that trial counsel was not ineffective for failing to secure an expert witness where counsel had consulted with an expert who supported the findings of the State and would not have benefitted the petitioner's case at trial). Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel on this issue.

## B. Failing to Object to State's Expert Witness

Petitioner claims that trial counsel was ineffective for failing to object to the State's witness, Dr. Gerber, and for stipulating that he was an expert. At the post-conviction hearing, trial counsel explained that, in a tactical decision, he chose to stipulate that Dr. Gerber was an expert rather than force the jury to focus on the extensive credentials of the doctor by challenging his status as an expert. The post-conviction court found this testimony to be credible and an "informed, tactical decision." As stated above, this Court may not second-guess a reasonably-based trial strategy. *See Adkins*, 911 S.W.2d at 347. Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel on this issue.

## C. Failing to Obtain X-rays Prior to Trial

Petitioner claims that trial counsel failed to secure x-rays of the victim prior to trial. The State argues that Petitioner has waived this claim for failure to include the transcript of the second trial in the record. We disagree. This Court may take judicial notice of court records in earlier proceedings of the same case. *See Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn. 1987). Trial counsel testified at the post-conviction hearing the trial court "sent for the x-rays . . . and they were actually produced during the trial" but trial counsel was unable to recall whether this was during the first or second trial. Trial counsel further testified that

-12-

the "CT scans were in the hands of the lawyer that was assisting [him] in trying to locate an expert." The post-conviction court accredited the testimony of trial counsel. Our review of the record reveals that, at the first trial, the x-ray from Summit Medical Center was not admitted into evidence. Instead, the testimony of the doctors was about the CT scan of the victim's skull. At the second trial, however, the x-ray from Summit Medical Center was introduced into evidence as exhibit 22. The x-ray was requested for the first time by either party during the trial itself. We acknowledge the Petitioner is correct in his assertion that trial counsel failed to secure this x-ray prior to the second trial. However, Petitioner has not shown how he suffered prejudice by trial counsel's failure to secure the x-ray prior to trial. Petitioner has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel on this issue.

### D. Failing to Investigate and Prepare for Trial

Petitioner alleges various deficiencies in trial counsel's preparation of witnesses prior to trial and preparation and investigation for trial. Specifically, Petitioner complains that trial counsel did not investigate the placement of the trash bag, did not request luminol testing of the floor and clothing, did not examine the floor of the apartment, and was not prepared for the second trial of the case.

Petitioner did not present evidence at the evidentiary hearing about the luminol testing or the placement of the trash bag. Further, Petitioner's brief does not cite to any portion of the record. This issue is waived. *See* Tenn. R. Crim. App. 10(b).

Likewise, Petitioner does not provide citations to the record with regard to his argument that trial counsel was deficient in failing to examine the floor of one of Petitioner's neighbors. Despite this deficiency, there was testimony at the post-conviction hearing from trial counsel that Petitioner never gave trial counsel any indication that viewing an apartment similar to his was an option. Petitioner, on the other hand, testified that he had arranged this viewing with a maintenance man. The post-conviction court accredited the testimony of trial counsel. Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel on this issue.

The testimony at the post-conviction hearing revealed that immediately preceding the second trial, trial counsel was involved in a high-profile case out of Dickson County. Trial counsel testified at the post-conviction hearing that he never made statements that he was unprepared and, in all honesty, could not imagine being more prepared because he was trying Petitioner's case for the second time. The post-conviction court accredited the testimony of trial counsel. Petitioner in this case has failed to establish by clear and convincing evidence

-13-

that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel on this issue.

Petitioner also argues that trial counsel should have presented the testimony of Marvin Hampton and Renell Davis at the second trial. According to Petitioner, Mr. Hampton could have testified as to the age of the bruise on the victim's face. Mr. Hampton did not testify at the post-conviction hearing. Instead, Petitioner introduced the sworn testimony of Mr. Hampton from the first trial and argues that the sworn testimony relieves him of the obligation to call Mr. Hampton as a witness at the hearing. Trial counsel was not questioned at the post-conviction hearing about his decision not to call Mr. Hampton as a witness at the second trial.

During the first trial, Mr. Hampton testified about what Petitioner told him regarding the age of the bruise on the victim's face. The State objected on hearsay grounds and the objection was sustained. Petitioner argues that trial counsel should have attempted to introduce the testimony at the second trial. The post-conviction court determined that Petitioner has failed to show how trial counsel's failure to attempt to introduce potential hearsay testimony was prejudicial. We agree. The evidence does not preponderate against the findings of the post-conviction court.

Further, the evidence does not preponderate against the post-conviction court's determination that trial counsel was not ineffective for failing to call Petitioner's mother as a witness at the second trial. Petitioner's mother testified at the post-conviction hearing. Ms. Davis testified that she had a photograph of Petitioner wearing the shirt that he claimed he was wearing on the day of the victim's injuries. There was no additional testimony that the picture depicted the shirt that Petitioner was wearing or that the picture was actually taken after the offense. The post-conviction court determined that this did not establish a deficiency. We agree. Petitioner has failed to establish prejudice. The evidence does not preponderate against the decision of the post–conviction court.

Petitioner also argues that trial counsel instructed him to show no emotion during trial and that this advice led to ineffective assistance of counsel. Trial counsel testified that he did not instruct Petitioner to show no emotion during either trial. The post-conviction court accredited the testimony of trial counsel. Petitioner has failed to establish prejudice. He is not entitled to relief on this issue.

### E. *Failing to Object to the use of the Doll by the State at Trial*

Petitioner argues that trial counsel was ineffective for failing to prevent the State from using a doll as demonstrative evidence and for failing to prevent the State from cross-

examining Petitioner using the same doll. The State argues that Petitioner has waived this issue by failing to cite to the record.

At the post-conviction hearing, trial counsel testified that he did not file a pretrial motion or object to the use of the doll for strategy reasons. Trial counsel explained that he spoke with several of the jurors from the first trial to find out their impression on the use of the doll as demonstrative evidence. According to trial counsel, the jurors were offended by the use of the doll and found that it hurt the State's case. Thus, trial counsel explained that he did not object to the use of the doll as a strategic decision. The post-conviction court accredited the testimony of trial counsel. The evidence does not preponderate against the decision of the post-conviction court. Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel on this issue.

### F. Failing to Address Certain Issues During Closing Argument

Petitioner argues that trial counsel failed to present an effective closing argument. The post-conviction court determined that Petitioner did not put on any evidence or testimony regarding closing argument and, thus, waived the issue. Further, the post-conviction court determined that Petitioner failed to establish prejudice. The transcript of the post-conviction hearing does not indicate that trial counsel was questioned about the closing argument or that Petitioner presented evidence to show that the argument was somehow inadequate. The evidence does not preponderate against the decision of the post-conviction court. Petitioner is not entitled to relief on this issue.

### G. Cumulative Error

Petitioner alleges that cumulative errors of trial counsel prejudiced him at trial. Petitioner raises this issue for the first time on appeal. When a petitioner raises an issue for the first time on appeal, that issue is waived. *See Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996). Petitioner has waived this issue.

### II. Constitutional Error Committed by Trial Court

Finally, for the first time on appeal, Petitioner argues that the trial court committed constitutional error "by allowing the prosecution . . . to require Petitioner to demonstrate events using a doll and by subsequently allowing the prosecution . . . to inflame the emotions of the jury by his further improper use of the doll." Petitioner urges this Court to examine the issue via a plain error analysis. We decline to do so. As stated previously, issues raised for the first time on appeal are waived. *See Black*, 938 S.W.2d at 403. Further, "the plain

error rule, which would otherwise permit an appellate court to address the issue sua sponte, may not be applied in post-conviction proceedings to grounds that would otherwise be deemed either waived or previously determined." *State v. Grindstaff*, 297 S.W.3d 208, 219 (Tenn. 2009). Petitioner has waived this issue.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.


_____
JERRY L. SMITH, JUDGE